Filed 12/3/15  P. v. Hoang CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>THANG VINH HOANG,<br><br>    Defendant and Appellant. | A139341<br><br>(San Mateo County<br>Super. Ct. No. SC076529A) |

**I.**

**INTRODUCTION**

A jury convicted Thang Vinh Hoang of unlawful cultivation of marijuana (Health & Saf. Code, § 11358[1]), possession of marijuana with intent to sell (§ 11359) and utilities theft (Pen. Code, § 484).  Hoang was sentenced to probation which required him to abstain from the use or cultivation of marijuana, although this term could be modified upon a showing that limited medicinal use was appropriate.  On appeal Hoang challenges his drug convictions on three grounds: (1) insufficient evidence; (2) the admission of improper expert testimony; and (3) erroneous jury instruction.  Alternatively, Hoang contends that the probation condition prohibiting him from using marijuana is invalid. We affirm the judgment and sentence.

---

[1] Unless otherwise stated, statutory references are to the Health and Safety Code.

# II.

# STATEMENT OF FACTS

## A. *The Prosecution Case*

### 1. Discovery of the Marijuana Growing Operation

In October 2011, the Daly City Police Department received a 911 call for assistance from a cell phone traced to a residence on Pinehaven Drive (Pinehaven). When officers went there to conduct a welfare check, nobody answered the door, but lights inside the home were going on and off and a few windows were opened. The officers used a ladder to look inside a window and saw what appeared to be a marijuana "cultivation operation." After determining that the 911 caller was a previous tenant at Pinehaven, the police reported their discovery to the San Mateo County Narcotics Task Force (NTF).

On December 14, 2011, at around 5:00 a.m., San Mateo County Narcotics Task Force (NTF) Agent Lance Sandri went to Pinehaven to look for physical signs of a commercial marijuana growing operation. It appeared to Sandri that someone had recently arrived at Pinehaven because a silver van in the driveway did not have condensation on the windows like other cars parked in that neighborhood. Sandri noticed two large bags of potting soil in the back of the van. Moving closer to the house, he heard a loud humming noise which sounded like commercial fans, and when he put his hand in front of the mail slot, he felt a strong pull of air into the house.

In March 2012, Sandri returned to Pinehaven with another NTF agent, Jeremy Brandenburg. Again, the agents heard loud humming in the house and felt the pull of air through the mail slot. By that time, Sandri had identified Hoang as the owner of the silver van and traced him to a residence on Seacliff Avenue (Seacliff), approximately five minutes away from Pinehaven. The NTF agents conducted surveillance at Seacliff and Pinehaven for several days. Hoang, the silver van, and other cars linked to Hoang were observed moving between the two houses.

## 2. The Search Warrants

On the afternoon of March 27, 2012, the NTF executed a search warrant at Pinehaven. Photocopies of four medical marijuana recommendations were posted near the front door, one for Hoang, one for his wife Thuy Nguyen, and the other two for individuals named Lan Hoang and Hiep Nguyen. During their prior surveillance, agents had seen Hoang's wife at Pinehaven only once and had never seen the other individuals there. The recommendations for Hoang and his wife both stated: "This patient may grow 99 mature plants and possess 19 pounds of processed cannabis for their yearly medical needs." The other two recommendations were for the same amounts with slightly different language. An agent attempted to contact the doctor whose name appeared on all four recommendations, but was unable to reach him by telephone.

When Pinehaven was searched, every room in the unoccupied house appeared to contain evidence of a commercial marijuana growing operation. In the kitchen agents found several boxes of oven roasting bags, which are commonly used in marijuana trafficking because they hold one pound of marijuana bud and are thought to lock in freshness. The living room windows were covered with blackout curtains, which are used to conceal activity conducted in a grow house. A front room window was encased in a box which held a small light attached to a timer, a device that is used by illegal grow houses to create the appearance that people are actually living there. Somebody had bypassed the Pacific Gas and Electric (PG&E) electricity meter, which not only avoided high electricity bills, but helped prevent detection of high electricity use. There were a few burnt marijuana cigarettes in an ash tray, but no evidence that anyone was using Pinehaven to cook or make food products with marijuana.

Two large rooms on the second floor of Pinehaven were equipped with special growing lights, wall coverings, curtains, fans and other equipment designed to facilitate plant growth. One room contained 40 marijuana plants in a flowering stage, which would be ready to harvest in one or two months time. The other room featured a more sophisticated lighting system, and contained 299 marijuana plants in various stages of growth. In the closet of that room, the agents recovered 40 ounces of marijuana drying in

a tray. They found 15 smaller marijuana plants in a second floor closet that was set up as a germination room, with a special light to stimulate the first stage of plant growth. A plastic garbage bag filled with 10 ounces of partially processed marijuana bud was in the second floor bathroom. The bathroom also contained a 55-gallon plastic drum of water mixed with chemicals and fertilizers; a garden hose; a plastic tray for growing small plants; and several containers of fertilizer stored under the sink.

There were two additional growing rooms on the lower level of Pinehaven. One room contained 84 plants that would be ready to process in a few weeks. In a corner, someone had collected plant debris, broken equipment, and containers of "shake," a part of the marijuana plant often considered unmarketable but which cannot be thrown in the garbage without risking detection. Similar garbage was stored in the first floor bathroom, which also featured a counter that a person could walk behind. The counter held a digital scale, plastic oven bags, and sulfur tablets which are used to facilitate marijuana growth. A second growing room on the ground level contained an additional 100 marijuana plants.

While Pinehaven was being searched, NTF Agent Cameron Christensen was stationed at Seacliff, and when Hoang left there in the silver van, Christensen followed. Hoang drove to Pinehaven, hesitated in front of the house where the NTF agents could been seen, and then drove on until he was stopped a few blocks away and taken into custody. Later that evening, NTF agents executed a search warrant at Seacliff. Appellant's wife, Thuy Nguyen, and three children were present at the house. In a nightstand in the master bedroom, agents found $6,200, all in $100 bills. Nguyen denied knowing anything about the marijuana at Pinehaven and told the agents the money was from her beauty salon business. The agents did not find any indicia of marijuana growing or use at Seacliff.

### 3. Expert Testimony

At trial, Agent Brandenburg qualified as an expert on two subjects, possession of marijuana for sale and marijuana grow houses. Brandenburg testified that the two most common circumstances distinguishing a commercial grow house from a marijuana

4

cultivation for personal use are (1) the quantity of product being produced; and (2) the use of a PG&E bypass device. Generally, personal users grow a small quantity of marijuana in a readily accessible place like a room or garage in their home; they do not cultivate a large harvest requiring processing and storage, but grow a small amount of plants at different stages so they can always have a "fresh off the plant" product. Brandenburg opined that a typical personal use grower might have 10 to 15 plants.[2]

Brandenburg testified that his conversations with hundreds of medicinal marijuana users about their daily consumption reflect a range of need, with some people using only one or two grams and at least one person Brandenburg knows who consumes 10 grams a day. Brandenburg used an average of four grams of bud a day and a top range estimate of 10 grams a day to calculate the total average consumption of a medicinal marijuana user during the four month growth cycle of a marijuana plant. He concluded that a typical medical marijuana patient needs approximately 480 grams of marijuana bud to cover the four-month period, while a heavy user needs a four-month supply of approximately 2.6 pounds. Thus, Brandenburg testified, in order for a harvest to meet the needs of four heavy medicinal users for a four-month period, a single harvest would need to yield 10.6 pounds of marijuana bud.

Brandenburg testified that the marijuana cultivation at Pinehaven would have yielded significantly more than 10.6 pounds of marijuana bud during the four-month period after the NTF executed its search warrant. According to Brandenburg, an indoor marijuana plant yields approximately four ounces of marijuana bud. When Pinehaven was searched, there were 184 plants that would have been ready to harvest in a few weeks when they would yield approximately 46 pounds of marijuana bud. One hundred forty plants would have been ready for harvest a month later and yielded an additional 35 pounds of product. And, the remaining 200 smaller plants would have been ready for harvest approximately three months after the search was conducted and would yield an

---

[2] Brandenburg has seen cases where personal use growers had as many as 30 to 40 plants, and in those situations there would typically be a discussion about the person's actual needs and an agreement to reduce the yield to something closer to 15 plants.

additional 49.75 pounds of marijuana.  Thus, Brandenburg calculated that the total yield of the Pinehaven growing operation during the four-month period following the NTF search would have been 130.75 pounds of marijuana bud.[3]

Drawing on his experience and the evidence amassed during the Pinehaven investigation, Brandenburg concluded that some of the marijuana at Pinehaven was grown for personal use, but the majority of it was cultivated for purposes of sale. According to Brandenburg, it is not uncommon for a seller in the drug trade to make use of his own product.  In this case, Brandenburg opined that Hoang was a marijuana seller/user who contracted with someone else to handle the distribution of his product.

When asked about the recommendations posted on the wall at Pinehaven, Brandenburg testified that doctors make these types of recommendations because federal law prohibits writing a prescription for medical marijuana.  In this case, the doctor whose name appeared on the recommendations was from Upper Lake, which is north of Clear Lake, approximately two and one-half hours away from Hoang's Daly City home. According to Brandenburg, medical marijuana cultivation in the northern part of California is typically done outside, and an outside crop requires more plants than an indoor crop because of environmental factors, like bug infestations and deer who love to eat marijuana plants.  A recommendation of 99 plants and 19 pounds for a year might be appropriate for an outside medical marijuana cultivation in a northern county, but Brandenburg testified that it is not a common recommendation for the San Francisco Bay Area.

### B.  The Defense Case

Appellant's first trial witness was Dr. Eugene Schoenfeld, a medical doctor and psychiatrist who testified as an expert on the subject of medical marijuana.  Schoenfeld

---

[3] According to the trial evidence, the commercial value of marijuana bud varies between $2,000 and $8,000 per pound depending on where in the country the product is sold.  Furthermore, it is much cheaper to buy marijuana in bulk.  In California, for example, a pound can be broken down and sold for $20 a gram, which would translate into $9,000 for the entire pound.

reviewed medical records from Hoang and his wife, Thuy Nguyen, which showed that Hoang had reported suffering from insomnia, gastrointestinal problems and hemorrhoids, and that Nguyen reported she suffered from migraines. Schoenfeld testified that in his opinion, all of these conditions can be treated with medicinal marijuana.

According to the records Schoenfeld reviewed, Hoang and Nguyen both reported that they smoke marijuana, but Schoenfeld testified they told him that they mostly use marijuana in its edible form. According to Schoenfeld, people who consume marijuana by eating it need larger quantities than smokers because the smoke has a direct impact, whereas the eaten product has to be digested. Schoenfeld testified that he does not know Milan Hopkins, the doctor who allegedly provided the marijuana recommendations in this case, but he did know that Hopkins was the subject of an administrative action and facing possible suspension of his medical license.

The second defense witness at trial was Christ Conrad, an author and activist for reform of marijuana laws who has studied the plant since the 1990's. Conrad was qualified to offer an expert opinion on the condition of the Pinehaven plants and the expected yield of that garden. Using photographs, Conrad explained to the jury that he believed some of the plants on the lower level of Pinehaven had a fungus called botrytis or "bud rot." Evidence that the gardeners were using sulfur in the downstairs rooms showed they were aware of the problem and trying to treat it. Conrad testified that bud rot can devastate a marijuana garden; it attacks the flowers of the plant, rots them from the inside out and kills the plant. Based on the photographs he was shown, Conrad estimated that as much as 25 percent of the lower floor grow room was infected. Conrad also testified that the spores could travel and affect the upper level plants as well.

Conrad offered an opinion regarding the likely yield of the Pinehaven garden assuming his conclusions about bud rot were true. To reach that opinion, he employed two different formulas, using their outcome to calculate an average mean. The first formula, used in federal studies to predict the yield of an outdoor garden, makes a predication based on the square footage of the garden. The second formula, commonly used for indoor gardens, predicts yield based on the number of grow lamps used to

7

cultivate plants at the flowering stage of the growth cycle. Conrad testified that he performed both calculations for the Pinehaven garden, added the products together and then divided by two to get "a mean average of about 9.25 pounds from the flowering garden" at Pinehaven. Thus, Conrad offered the opinion that if the Pinehaven gardeners successfully harvested their entire crop four times over the period of a year, the total yield for the garden would be 37 pounds.

According to Conrad, the average user of medicinal marijuana smokes approximately 6.65 pounds of marijuana a year. Using that figure, Conrad opined that if the Pinehaven garden was 100 percent successful, its yield would be enough for six people to smoke medicinal marijuana for one year. However, in his opinion, the estimated yield for the Pinehaven garden needed to be reduced by 25 percent to account for the bud rot. Conrad also testified that people who eat cannabis may need as much as four times the amount to get the same effect as smoking it.

After the defense experts testified, Hoang presented percipient witness testimony from his sister Anh Hoang, and his wife Thuy Nguyen. Anh Hoang testified that Hoang was living in China in the early 1990's when he had a motorcycle accident. He was in a coma for several days and had to wear a body cast that covered his head, arms, and legs. In 1997, Anh moved with Hoang to the United States and she has stayed close with him. Anh testified that the accident changed her brother because he constantly complains about pain and headaches and he is unable to work.

Thuy Nguyen testified that when the NTF executed the search warrant at Seacliff, she denied knowing anything about the marijuana at Pinehaven because she was afraid the police would take her away from her children. Later, after she had time to calm down, she told the authorities that she had a doctor's permission to smoke marijuana. Nguyen testified that she and Hoang went together to see Dr. Milan Hopkins and he gave them permission to use marijuana because of her migraine headaches and Hoang's "sickness." Nguyen testified that Hoang has sleep problems and back and leg pain. She also explained that they shared the Pinehaven garden with her sister and brother-in-law

who both have marijuana recommendations. Nguyen testified that she personally used Pinehaven as a place to smoke marijuana for her headaches.

## III.

## DISCUSSION

The issues on appeal pertain exclusively to Hoang's convictions for unlawful cultivation and possession of marijuana. Hoang contends his drug convictions must be reversed because he established a "compassionate use" defense, which the prosecution failed to rebut with admissible evidence, and which the jury would likely have accepted if the trial court had excluded incompetent expert testimony and properly instructed them.

### A. Statutory Framework

To facilitate our analysis, we briefly review two statutes which authorize use of medical marijuana under certain circumstances: the Compassionate Use Act of 1996 (the CUA; § 11362.5); and the Medical Marijuana Program (the MMP; § 11362.7 et seq.).

"In 1996, the California electorate approved Proposition 215 and adopted the CUA, which provides: 'Section 11357, relating to the possession of marijuana, and Section 11358, relating to the cultivation of marijuana, shall not apply to a patient, or to a patient's primary caregiver, who possesses or cultivates marijuana for the personal medical purposes of the patient upon the written or oral recommendation or approval of a physician.' (§ 11362.5, subd. (d).) By this and related provisions, the CUA provides an affirmative defense to prosecution for the crimes of possession and cultivation. [Citations.]" (*People v. Kelly* (2010) 47 Cal.4th 1008, 1012-1013, fn. omitted (*Kelly*).)

The CUA does not quantify the amount of marijuana that a patient may lawfully possess or cultivate for his or her "personal medical purposes." (§ 11362.5, subd. (d).) Case law establishes that "the quantity possessed by the patient . . . , and the form and manner in which it is possessed, should be reasonably related to the patient's current medical needs." (*People v. Trippet* (1997) 56 Cal.App.4th 1532, 1549; see also *People v. Wayman* (2010) 189 Cal.App.4th 215, 223; *People v. Windus* (2008) 165 Cal.App.4th 634, 643; *People v. Frazier* (2005) 128 Cal.App.4th 807, 824–825 (*Frazier*).)

The defendant carries the burden of proving a CUA defense, i.e., that his possession/cultivation was for personal medical purposes, was authorized by a physician, and that the quantity in his possession was reasonably related to his current medical needs.  (*People v. Mower* (2002) 28 Cal.4th 457 (*Mower*); *Frazier*, *supra*, 128 Cal.App.4th at p. 818.)  The "defendant may not merely point to the defense, but has the burden to raise a reasonable doubt about the facts underlying this defense." (*Frazier*, *supra*, at p. 818, applying *Mower*, *supra*, at pp. 477, 481.)

In 2003, the Legislature enacted the MMP.  (*People v. Dowl* (2013) 57 Cal.4th 1079, 1086 (*Dowl*).)  "At the heart of the MMP is a voluntary 'identification card' scheme that, unlike the CUA—which . . . provides only an affirmative defense to a charge of possession or cultivation—provides protection against arrest for those and related crimes." (*Kelly*, *supra*, 47 Cal.4th at p. 1014, italics omitted.)  Also in contrast to the CUA, the MMP imposes quantity limitations on individuals protected by this statute. (*Id*. at p. 1015.)  Generally, the MMP establishes a baseline authorization for individuals who qualify for the program to possess eight ounces of dried marijuana and no more than six mature or 12 immature marijuana plants, and then it provides qualified exceptions for even greater amounts.  (*Kelly*, at p. 1016; § 11362.77, subds. (a)-(c).)

The quantity restrictions imposed under the MMP do not affect a patient's right under the CUA to cultivate and possess the amount of marijuana reasonably necessary to meet his current medical needs.  (*Kelly*, *supra*, 47 Cal.App.4th at p. 1049.)  "Whether or not a person entitled to register under the MMP elects to do so, that individual, so long as he or she meets the definition of a patient or primary caregiver under the CUA, retains all the rights afforded by the CUA.  Thus, such a person may assert, as a defense in court, that he or she possessed or cultivated an amount of marijuana reasonably related to meet his or her current medical needs [citation] without reference to the specific quantitative limitations specified by the MMP."  (*Ibid*.)

### B.  Sufficiency of the Evidence

Hoang contends there is insufficient evidence to support his drug convictions because he raised a reasonable doubt as to the facts establishing a CUA defense and the

10

prosecution failed to rebut that defense by establishing beyond on a reasonable doubt that his possession and cultivation of marijuana was not authorized for medical purposes.

The trial court used a version of CALCRIM No. 2370 to instruct the jury about Hoang's CUA defense, which stated: "Possession or cultivation of marijuana is lawful if authorized by the Compassionate Use Act. The Compassionate Use Act allows a person to possess or cultivate marijuana (for personal medical purposes) when a physician has recommended [or approved] such use. The amount of marijuana possessed or cultivated must be reasonably related to the patient's current medical needs. The People have the burden of proving beyond a reasonable doubt that the defendant was not authorized to possess or cultivate marijuana for medical purposes. If the People have not met this burden, you must find the defendant not guilty of this crime."

The People did not object to this instruction in the trial court, and they do not complain about it here. Therefore, we accept for purposes of appeal that substantial evidence supported this CUA defense instruction. (See *People v. Salas* (2006) 37 Cal.4th 967, 982 ["defendant has a right to have the trial court, on its own initiative, give a jury instruction on any affirmative defense for which the record contains substantial evidence"].) However we reject Hoang's assumption that the jury was required to accept his evidence. " '[S]ubstantial evidence' means evidence of a defense, which, if believed, would be sufficient for a reasonable jury to find a reasonable doubt as to the defendant's guilt. [Citation.]" (*People v. Givan* (2015) 233 Cal.App.4th 335, 343-344.) Here, there are many reasons the jury could reasonably have concluded that Hoang's evidence was not worthy of belief.

For example, the jury could have found that the medical marijuana recommendations posted at Pinehaven were not legitimate. Although photocopies of those recommendations were admitted into evidence, the recommending doctor did not appear to verify or explain them. Instead, the defense relied solely on the expert opinion of a non-treating physician. Dr. Schoenfeld offered his expert opinion that the recommendations were appropriate for Hoang and his wife, but he was not their doctor and readily admitted that he did not know Dr. Milan Hopkins, the doctor who allegedly

11

issued the recommendations, and who was facing possible suspension of his medical license at the time of trial.

Alternatively, the jury could have concluded that Hoang and his wife had valid marijuana recommendations, but that the other two individuals did not. Dr. Schoenfeld did not offer any opinion regarding the medicinal needs of those two people. At best, the marijuana recommendations for Hoang and his wife authorized a cultivation of 198 plants to meet their yearly medical needs. However, NTF seized more than 500 plants from Pinehaven and the prosecution established that all of those plants would have been harvested within a four-month period and would have yielded 130.75 pounds of marijuana, significantly more than the 38 pounds allegedly authorized by Dr. Hopkins for the yearly medical needs of Hoang and his wife.

The jury also could have concluded that Hoang and his associates had a doctor's approval to use medicinal marijuana, but that the amount of plants at Pinehaven was not reasonably related to their current medical needs. In this regard, we do not share Hoang's apparent assumption that the annualized amount of marijuana "authorized" by Hopkins's recommendations is prima facie proof of the *current* medical needs of the four individuals. As discussed above, the quantity of marijuana that an individual protected by the CUA may lawfully possess and cultivates depends on a current needs determination. (*Kelly*, *supra*, 47 Cal.4th at p. 1049.) Moreover, a recommendation for a specified amount of marijuana to cover a medicinal user's projected yearly needs is inherently suspect. Certainly a defendant cannot immunize himself from prosecution for illegal possession or cultivation by obtaining a blanket annualized authorization to possess a large amount of marijuana which is not tethered to a current assessment of need.

Even if the marijuana recommendations and Dr. Schoenfeld's opinion about them raised a reasonable doubt in the jury's mind about whether Hoang came within the protection of the CUA, the trial evidence substantially supports findings beyond a reasonable doubt that Pinehaven was a commercial grow house, and that Hoang cultivated and possessed marijuana not just for his own personal use but for purposes of

12

sale.  Both the defense and the prosecution relied on expert testimony to support their very different theories about the amount of marijuana that was necessary to meet the current needs of the four individuals who allegedly used the Pinehaven cultivation.  Both elicited opinions regarding the average consumption of medicinal users and the likely yield of the Pinehaven garden and, obviously, the jury was more persuaded by the prosecution case.

For all these reasons, we conclude that the record contains substantial evidence supporting Hoang's convictions for unlawful cultivation and possession marijuana.

### C. Expert Opinion Testimony

Hoang contends that the prosecution case was flawed because it relied on incompetent expert testimony to establish the intent elements of the drug charges. " 'Trial courts exercise discretion in determining both the admissibility of evidence under Evidence Code section 352 [citation] and a witness's expert status [citation].' [Citation.]." (*People v. Gonzalez* (2006) 38 Cal.4th 932, 944.)  Here, Hoang argues that the trial court abused its discretion by permitting Agent Brandenburg to offer an expert opinion that the marijuana at Pinehaven was cultivated and possessed for purposes of sale, rather than for the personal medical needs of Hoang and his associates.

Hoang forfeited this claim by failing to raise it at trial.  (*Dowl*, *supra*, 57 Cal.4th 1079, 1087-1089.)  "[A] defendant who fails at trial to object that a witness lacks the qualifications to render an expert opinion may not on appeal contest the opinion's admissibility.  [Citations.]  This rule helps the trial court 'take steps to prevent error from infecting the remainder of the trial' and to develop an adequate record.  [Citation.] 'Equally important,' it 'afford[s] the prosecution the opportunity to . . . provide additional foundation for the admission of evidence . . . .'  [Citation.]  It thus ensures that the party offering the evidence has an opportunity to address any objection and ' "prevents a party from engaging in gamesmanship by choosing not to object, awaiting the outcome, and then claiming error." '  [Citation.]" (*Id.* at pp. 1087-1088.)

Furthermore, Hoang's objection lacks merit.  His theory boils down to the contention that a law enforcement officer is not qualified to offer an expert opinion

13

regarding the purpose of a marijuana cultivation in any case in which the defendant asserts a CUA defense because that officer is not qualified to assess the defendant's medical needs. However, Agent Brandenburg did not offer an expert opinion about Hoang's medical condition or his personal use needs. Rather, he drew on his extensive experience dealing with both commercial grow operations and medicinal marijuana users to formulate the opinion that even if Hoang was a medicinal marijuana user, the Pinehaven garden was cultivated and possessed for purposes of sale. In light of the testimony regarding Brandenburg's experience in this area and the defendant's failure to object while Brandenburg was on the witness stand, the trial court did not abuse its discretion by admitting Brandenburg's opinion.

Taking a different tack, Hoang complains that Brandenburg's expert opinion that the Pinehaven cultivation was intended for sale was based solely on his legally improper subsidiary opinion that there were simply "too many" plants at that location. Hoang argues that this underlying opinion regarding how many plants are too many was improper because it violated settled law establishing that the CUA does not impose any specific quantity limitation on protected individuals. (Citing *Kelly*, *supra*, 47 Cal.4th at p. 1049.)

First, Hoang mischaracterizes Brandenburg's expert testimony. Brandenburg opined that some of the marijuana at Pinehaven may have been cultivated and possessed for personal use, but the majority of the plants at that location were grown and possessed for purposes of sale. Although the quantity of plants discovered at Pinehaven was one important basis for this conclusion, Brandenburg also stressed that the use of a PG&E bypass system was indicative of a commercial operation. Furthermore, as discussed in our factual summary, Brandenburg testified about numerous other indicia that Pinehaven was a commercial grow house, including the measures that had been taken to conceal activities inside the house and create the impression that someone was living there; the sophisticated equipment designed to facilitate plant growth; the plastic bags, sulfur tablets, scale and other items commonly used in commercial marijuana operations; and

14

the presence of plant debris and broken equipment that could not be thrown in the garbage without risking detection.

Second, Hoang misconstrues the relevant case law. In *Kelly, supra*, 47 Cal.4th 1008, the Supreme Court held that an individual protected by the CUA may possess or cultivate the amount of marijuana that is reasonably related to meet his or her current medical needs regardless of the "specific quantitative limitations specified by the MMP." (*Id*. at p. 1049.) But the *Kelly* court did not even suggest that the quantity of marijuana possessed or cultivated by an individual is irrelevant to an assessment of his or her current medical needs. Indeed, since the CUA requires that the amount be reasonably related to current need, quantity is necessarily a relevant factor.

Here Agent Brandenburg's testimony did not violate the letter or spirit of *Kelly*, *supra*, 47 Cal.4th 1008, because none of his opinions were based on the quantity limitations specified in the MMP. Indeed, Brandenburg did not even offer an expert opinion about the quantity of marijuana that Hoang required for his medical needs. Rather, he testified that in his experience, the number of plants in a marijuana garden was a factor which distinguished a personal use garden from a commercial grow house. As our Supreme Court has recently affirmed, " '[i]n cases involving possession of marijuana and heroin, it is settled that an officer with experience in the narcotics field may give his opinion that the narcotics are held for purposes of sale based upon matters such as quantity, packaging, and the normal use of an individual. On the basis of such testimony convictions of possession for purposes of sale have been upheld. [Citations.]' " (*Dowl*, *supra*, 57 Cal.4th at p. 1084.) Thus, Brandenburg's ultimate opinion regarding Hoang's intent to sell marijuana was not objectionable solely because it was based in part on the size of the Pinehaven garden. (*Ibid.*)

### D. Jury Instructions

Hoang contends the trial court erred by (1) rejecting a special pinpoint jury instruction regarding Hoang's CUA defense, and (2) failing to instruct sua sponte that testimony by a law enforcement witness is not entitled to any special weight.

15

### 1. Legal Principles and Standard of Review

"A trial court must instruct the jury, even without a request, on all general principles of law that are ' "closely and openly connected to the facts and that are necessary for the jury's understanding of the case." [Citation.] In addition, "a defendant has a right to an instruction that pinpoints the theory of the defense . . . ." ' [Citation.] The court may, however, 'properly refuse an instruction offered by the defendant if it incorrectly states the law, is argumentative, duplicative, or potentially confusing [citation], or if it is not supported by substantial evidence [citation].' [Citation.]" (*People v. Burney* (2009) 47 Cal.4th 203, 246.)

"We review defendant's claims of instructional error de novo. [Citations.]" (*People v. Johnson* (2009) 180 Cal.App.4th 702, 707.) " ' "In determining whether error has been committed in giving or not giving jury instructions, we must consider the instructions as a whole . . . [and] assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given. [Citation.]" ' [Citation.] "Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation." [Citation.]' [Citation.]" (*Ibid.*)

### 2. The Pinpoint Instruction

As discussed earlier, the trial court used a version of CALCRIM No. 2370 to instruct the jury about Hoang's CUA defense. However, the court denied Hoang's request to supplement that model instruction with the following special instruction:

"Pursuant to the Compassionate Use Act, a qualified patient has a doctor's recommendation permitting the use of medicinal marijuana. [¶] A qualified patient may possess an amount of marijuana consistent with the patient's needs. Only the dried mature processed flowers of female cannabis plant shall be considered when determining allowable quantities of marijuana under this section."

At trial, Hoang argued he was entitled to this instruction because "allowing the jury to understand what part of the marijuana plant is controlled by the California Compassionate Use Act will allow us to put forth our complete defense." However, the

16

trial court found the special instruction was an incorrect statement of the law and likely would mislead the jury. On appeal, Hoang insists his special instruction correctly states the law and without it the jury could not fully or fairly evaluate his CUA defense. We agree with the trial court.

The first sentence of Hoang's special instruction is duplicative of the CUA defense instruction which was given to the jury in this case, except to the extent it could be interpreted as instructing the jury to *assume* that the marijuana recommendation produced at trial automatically qualified Hoang for CUA protection, and, to that extent, giving the instruction would have been error since the question whether Hoang was protected by the CUA was for the jury to decide. The second sentence of the special instruction is incomplete and misleading because it fails to instruct that the amount of marijuana must be consistent with the patient's *current* medical needs. (See *Kelly*, *supra*, 47 Cal.4th at p. 1049.) Finally, the third sentence is inaccurate because, contrary to Hoang's repeated contentions in this case, the CUA does not state that "[o]nly the dried mature processed flowers of [the] female cannabis plant shall be considered when determining allowable quantities of marijuana under this section."

Hoang insists his special instruction is legally correct because it "mirrors the statutory language" in section 11362.77. This argument fails for two related reasons. First, the special instruction does not "mirror" section 11362.77, but rather its third sentence misleadingly paraphrases isolated language from subdivision (d) of that

provision.[4]  Second, section 11362.77, subdivision (d) is part of the MMP, it is not part of the CUA, and thus does not belong in a pinpoint instruction purporting to describe the protections afforded by the CUA.

As discussed at the outset of our analysis, the MMP serves a different function than the CUA; that program protects qualified patients from arrest for unlawful cultivation, possession and other offenses provided that certain quantity limitations which are set forth in section 11362.77 are met.  Subdivision (d) of that section, the source of Hoang's special instruction, provides that when calculating the allowable quantity of marijuana that a qualified patient may possess under the MMP, "[o]nly the dried mature processed flowers of [the] female cannabis plant or the plant conversion shall be considered."  Unlike the MMP, the CUA does not impose specific quantity restrictions on protected individuals, but instead requires a determination by the trier of fact as to whether the amount of marijuana possessed and/or cultivated by the defendant was

---

[4]  Section 11362.77 states:  "(a) A qualified patient or primary caregiver may possess no more than eight ounces of dried marijuana per qualified patient. In addition, a qualified patient or primary caregiver may also maintain no more than six mature or 12 immature marijuana plants per qualified patient.  [¶] (b) If a qualified patient or primary caregiver has a doctor's recommendation that this quantity does not meet the qualified patient's medical needs, the qualified patient or primary caregiver may possess an amount of marijuana consistent with the patient's needs.  [¶] (c) Counties and cities may retain or enact medical marijuana guidelines allowing qualified patients or primary caregivers to exceed the state limits set forth in subdivision (a).  [¶] (d) Only the dried mature processed flowers of female cannabis plant or the plant conversion shall be considered when determining allowable quantities of marijuana under this section. [¶] (e) The Attorney General may recommend modifications to the possession or cultivation limits set forth in this section.  These recommendations, if any, shall be made to the Legislature no later than December 1, 2005, and may be made only after public comment and consultation with interested organizations, including, but not limited to, patients, health care professionals, researchers, law enforcement, and local governments. Any recommended modification shall be consistent with the intent of this article and shall be based on currently available scientific research.  [¶] (f) A qualified patient or a person holding a valid identification card, or the designated primary caregiver of that qualified patient or person, may possess amounts of marijuana consistent with this article."

18

reasonably related to the defendant's current medical needs. (*Kelly*, *supra*, 47 Cal.4th at p. 1049.)

In this case, Hoang does not dispute the jury received an accurate instruction regarding his CUA defense. To the extent his special instruction was not duplicative of the instruction that was given, it was misleading, confusing and inaccurate. Thus, the trial court did not err by refusing to give it.

### 3. Witness Credibility

Hoang contends the trial court failed to discharge its sua sponte duty to instruct the jury on general principles of law closely connected with the case because the jury was not told that testimony by law enforcement witnesses is not entitled to any special weight. Hoang insists this principle was crucial in this case because all of the prosecution witnesses were members of law enforcement.

The trial court used CALCRIM No. 226 to instruct the jury regarding the general principles of law pertaining to the credibility of witnesses. Thus, the jury was told: "You alone must judge the credibility or believability of the witnesses. In deciding whether testimony is true and accurate, use your common sense and experience. You must judge the testimony of each witness by the same standards, setting aside any bias or prejudice you may have. [¶] You may believe all, part, or none of any witness's testimony. Consider the testimony of each witness and decide how much of it you believe." The jury was also instructed that, in evaluating witness testimony, it could "consider anything that reasonably tends to prove or disprove the truth or accuracy of that testimony," and it was provided with a nonexclusive list of potentially relevant factors to consider when conducting that evaluation. The jury was further instructed that the meaning and importance of the opinions offered by experts in this case was for the jury "to decide," that in evaluating the "believability of an expert witness," it should "follow the instructions about the believability of witnesses generally," and that it was free to disregard any opinion that it found "unbelievable, unreasonable, or unsupported by the evidence."

19

These instructions were sufficient to discharge the trial court's sua sponte duty to instruct regarding the general principles of law pertaining to witness credibility. They clearly and accurately conveyed the principle that all witnesses, including experts, were subject to the same credibility evaluation and that it was up to the jury to assess their believability. Indeed, if the court had singled out law enforcement witnesses in a separate instruction, it could have been criticized for drawing an artificial distinction that would not have otherwise occurred to the jury.

Hoang mistakenly relies on *People v. Cummings* (1993) 4 Cal.4th 1233 (*Cummings*). One issue in that appeal from a death penalty judgment was whether the trial court erred by admitting testimony from a deputy sheriff about incriminating statements he overheard while escorting appellant and a codefendant to their cells during a break in the jury trial. The appellant argued that "admitting the testimony of a trusted court officer, who had been involved in seating and escorting the jurors and relaying juror messages to the court, would deny due process and a fair and impartial trial." (*Id.* at p. 1289.) Rejecting this claim, the *Cummings* court found that the deputy was not a principal or key prosecution witness, had relatively little and purely professional direct contact with the members of the jury, and was promptly removed from those duties when he became a witness. In addition, "[t]he jury was admonished that all witnesses' testimony was to be judged on the same basis and that no greater weight should be accorded to [the deputy] because he had been a deputy in the court." (*Id.* at pp. 1290-1291.)

Hoang contends that "*Cummings* requires a trial court to instruct a jury sua sponte not to give an officer's testimony any artificial weight merely because he is an officer." We disagree with this interpretation. As discussed above, the issue in *Cummings* pertained to the admissibility of evidence, not the scope of the trial court's sua sponte duty to instruct on general principles of law. Furthermore, a specific incident occurred during the *Cummings* trial which warranted a specific admonition about the deputy's testimony. Nothing comparable happened in this case. Finally, as reflected in the admonition that was made to the jury in *Cummings*, the relevant general principle of law

20

is that "all witnesses' testimony was to be judged on the same basis." (*Cummings*, *supra*, 4 Cal.4th at pp. 1290-1291.) That principle was fully covered by the witness credibility instructions that were given in this case.

Hoang also mistakenly relies on *People v. Hanna* (1939) 36 Cal.App.2d 333 (*Hanna*). The defendant in that case was convicted of attempted murder, attempted robbery and related crimes. On appeal he argued the trial court erred by denying his request to give the following jury instruction: " 'You are instructed that, in weighing evidence of the police officers, care must be used because of their natural and unavoidable tendency to procure and state evidence against the accused which will justify their arrest of the accused.' " (*Id*. at p. 335, italics omitted.) The *Hanna* court found this instruction was properly refused because "it is not the law that a police officer's testimony is to be judged by any other standard than that which applies to the average witness." (*Id*. at p. 337.) *Hanna* undermines Hoang's argument in this case because it illustrates that singling out police officer testimony in a special pinpoint instruction creates the danger of misleading the jury to treat testimony by a law enforcement officer differently than the average witness.

### E. The Probation Condition

Hoang contends that if we affirm his drug convictions, this court must strike a condition of his probation which restricts his "access" to medical marijuana.

#### 1. Background

At the sentencing hearing, Hoang objected to a recommendation in the probation report to impose a probation condition requiring him to abstain from using all controlled substances including marijuana. Hoang argued that he has a medical recommendation to use marijuana to address his "body ache and pain." The prosecutor countered that the evidence showed Hoang obtained a recommendation so that he could operate a marijuana business. The prosecutor also pointed out that if the court were to allow Hoang to possess marijuana, "then under medical marijuana laws he's allowed to grow it," and if both those activities are authorized, the same events that led to this case would likely recur. According to the prosecutor, "what is usually done in cases like this," is to give

21

the probation officer discretion to authorize medicinal use if an untainted recommendation is produced.

As the sentencing hearing progressed, Hoang also objected to statements in the probation report that the amount of marijuana discovered at Pinehaven far exceeded the recommendation of the prescribing doctor and that Hoang was part of a larger commercial marijuana operation. Defense counsel was adamant that Dr. Hopkins's recommendation was valid and that it authorized Hoang to grow and maintain the Pinehaven garden for his personal needs. The trial court observed that the jury obviously disagreed with these contentions.

After the parties completed their arguments, the trial court stated that the circumstances that most strongly influenced its sentencing determination were that Hoang had committed a theft of utility services and that he had abused the medicinal marijuana statutes. The court also acknowledged that Hoang had no significant prior record, and that this was not "the crime of the century," but it nevertheless found that this was a "serious" case. In light of these circumstances, the court sentenced Hoang to a term of three years supervised probation, imposing conditions which included drug testing and counseling as directed by the probation department.

The trial court also imposed the following condition regarding abstention from the use of controlled substances: "I'm not going to require abstention from alcohol, but I will . . . require abstention from the use of controlled substances at this time including marijuana and submit to chemical testing, however, I'll allow the probation department to review any marijuana request and propose[d] prescription with Mr. Hoang. They can seek to modify this probation to include that if they think it's appropriate."

### 2. Analysis

"The Legislature has placed in trial judges a broad discretion in the sentencing process, including the determination as to whether probation is appropriate and, if so, the conditions thereof. [Citation.] A condition of probation will not be held invalid unless it '(1) has no relationship to the crime of which the offender was convicted, (2) relates to conduct which is not in itself criminal, and (3) requires or forbids conduct which is not

reasonably related to future criminality. . . .' [Citation.]" (*People v. Lent* (1975) 15 Cal.3d 481, 486, fn. omitted (*Lent*).)

The "*Lent* test" is "conjunctive—all three prongs must be satisfied before a reviewing court will invalidate a probation term. [Citations.] As such, even if a condition of probation has no relationship to the crime of which a defendant was convicted and involves conduct that is not itself criminal, the condition is valid as long as the condition is reasonably related to preventing future criminality. [Citation.]' [Citations.]" (*People v. Leal* (2012) 210 Cal.App.4th 829, 840 (*Leal*).)

Here, the record demonstrates that the trial court properly exercised its discretion by imposing a probation condition that required Hoang to refrain from using all controlled substances, but authorized the probation department to seek a modification if Hoang produced persuasive evidence of a medicinal need to use marijuana. This condition was directly related to two of the *Lent* factors—Hoang's convictions for unlawful cultivation and possession with intent to sell and his future criminality. (*Lent*, *supra*, 15 Cal.3d at p. 486.) The trial evidence showed that Hoang committed his offenses by abusing a medical marijuana recommendation and, as the trial court found, the prior abuse justified a future restriction. (See, e.g., *People v. Brooks* (2010) 182 Cal.App.4th 1348, 1353.) Furthermore, the restriction that the court imposed was subject to future modification provided Hoang could make a satisfactory showing of medical need.

On appeal, Hoang contends that the trial court abused its discretion because it failed to consider the competing public policies implicated by the court's interference with his use of medical marijuana. To support this argument, Hoang relies on *Leal*, *supra*, 210 Cal.App.4th 829. In *Leal*, a jury convicted the defendant of possession of marijuana for sale while armed. At sentencing, the court also disposed of another marijuana charge that arose while defendant was on bail awaiting trial in the first case. The trial court sentenced the defendant to probation with a condition forbidding him to use marijuana even for medical reasons. (*Id*. at p. 833.) The *Leal* court affirmed the

judgment, rejecting appellant's contention that the trial court abused its discretion by imposing the probation condition. (*Ibid*.)

Although the *Leal* court incorporated the *Lent* test into its review, it found that an additional inquiry was necessary in order to evaluate whether the trial court properly exercised its discretion by imposing the marijuana restriction. (*Leal*, *supra,* 210 Cal.App.4th at pp. 843-844.) Specifically, the *Leal* court balanced the competing public policies that arise when a defendant has a CUA authorization to use medical marijuana and yet the relationship of his lawful use of marijuana to his crimes or his future criminality establishes a need to rehabilitate him and protect the public during his release on probation. (*Id*. at p. 844.)

The *Leal* court opined that its balancing test would "vary widely from case to case," suggesting that it would likely be an abuse of discretion to impose a probation condition banning the use of medical marijuana pursuant to the CUA by a person suffering from end-stage pancreatic cancer, but recognizing that "[f]ar more commonly, of course, the rehabilitative/protective need could outweigh a lesser medical need, or one that could be efficaciously met by alternative means." (*Leal*, *supra*, 210 Cal.App.4th at p. 844.) The *Leal* court found "abundant" evidence of a need to rehabilitate the appellant and "no evidence of an overriding medical need," notwithstanding the fact that the appellant had a CUA authorization that had never been challenged in the lower court. (*Ibid*.) Therefore, it concluded that appellant failed to show that the trial court's "implicit . . . finding that the balancing of needs favored prohibiting CUA use constituted an abuse of discretion." (*Id*. at p. 845, fn. omitted.)

The *Leal* balancing test reinforces our conclusion that the challenged probation condition was a proper exercise of the trial court's discretion in this case.[5] Even more so than in *Leal*, here the prosecution vigorously challenged the validity of Hoang's CUA authorization, characterizing it at closing argument as a sham and a cover for Hoang's clandestine commercial marijuana operation. As discussed above, the jury rejected Hoang's CUA defense, and the trial evidence supported that result. Notwithstanding his continued denials, Hoang's convictions essentially establish that he was operating a commercial marijuana grow house and that he used the CUA to shield himself from discovery and prosecution. Thus, strong evidence establishes that precluding Hoang from using marijuana unless and until he produces untainted proof of medical need would serve a valuable rehabilitative function, and would protect the public while he is on probation. Should a showing be made by Hoang during his probationary period that he has a legitimate medical need for medicinal marijuana, the probation order provides for modification of its conditions allowing such use. Therefore, the *Leal* balancing was assiduously applied by the trial court in considering its order of probation.

## IV.

## DISPOSITION

The judgment is affirmed.

---

[5] Strong language in the *Leal* opinion supports Hoang's contention that a probation condition restricting the use of medical marijuana must satisfy the *Leal* balancing test. (See, e.g., *Leal, supra*, 210 Cal.App.4th at p. 844.) However, we reject Hoang's suggestion that the trial court must explicitly weigh the competing policies on the record at the sentencing hearing. *Leal* itself affirmed a sentence based on the trial court's implicit finding that the competing policy concerns weighed in favor of imposing a complete ban on marijuana use in that case. (*Id.* at p. 845.)

_____
RUVOLO, P. J.

We concur:


_____
REARDON, J.


_____
STREETER, J.


A139341, *People v. Hoang*

26